### In re MARK ENTERPRISES, INC., Debtor.

### Bankruptcy No. BK 92–11317.

United States Bankruptcy Court, D. Rhode Island.

June 9, 1992.

Russell D. Raskin, Providence, R.I., for debtor.

Bruce W. Gladstone, Providence, R.I., for Maurice C. Paradis, Receiver of Rhode Island Cent. Credit Union.

## DECISION AND ORDER

ARTHUR N. VOTOLATO, Jr.,
Bankruptcy Judge.

Heard on June 3, 1992, on the emergency motions of Maurice C. Paradis, Receiver of Rhode Island Central Credit Union (the "Bank"), to Dismiss this Chapter 11 case; for Relief from the Automatic Stay; and to Prohibit the Debtor's Use of Cash Collateral. The Debtor vigorously opposes all three motions.[1] Based upon the evidence and the arguments, and for the following reasons, we overrule all three objections.

For purposes of this decision, and in order to provide expedited treatment of these urgent matters, the Court will address, in abbreviated fashion, the facts and issues relevant to the Bank's motions, and the Debtor's opposition.[2]

The Debtor, Mark Enterprises, Inc., is the owner of a real estate development known as the Hillsdale Mobile Home Park, located in West Kingston, Rhode Island. The property consists of approximately 166 mobile home sites, of which 107 are fully developed. Ninety-seven of these are presently rented at an average monthly payment of $225, and 59 remaining lots are in various stages of development, depending on who is describing the degree of development. The parties have stipulated that the present fair market value of this property is $1,550,000. Although the parties do not agree on an exact figure, it appears that the Bank is owed in the neighborhood of $2,800,000. Based upon these figures both parties agree, as does the Court, that the Debtor clearly has no equity in the subject property.

The Debtor filed for protection under Chapter 11 on May 1, 1992, at 9:45 a.m., fifteen minutes before a foreclosure sale of its property was to take place, and just after having been denied a request for temporary restraining order by Judge Robert Krause of the Providence County Superior Court. On May 27, 1992, the Bank filed the instant motions requesting an expedited hearing, and we scheduled and held an emergency hearing on June 3, 1992.

Although there are three separate motions before the Court, the dispositive issue in this litigation is whether the Debtor has shown a reasonable possibility of a successful reorganization within a reasonable time. *See United Sav. Ass'n v. Timbers of Inwood Forest*, 484 U.S. 365, 373, 108 S.Ct. 626, 631, 98 L.Ed.2d 740 (1988).

As a basis for our analysis, we start with the Debtor's evidence and representations concerning the implementation of its pro-

---

1. On a procedural note, the Debtor complains that it was unfairly put before the Court on short notice, without a sufficient opportunity to adequately prepare its case. However, based on the prior history between these parties, including the fact that the Debtor elected to file its Chapter 11 petition only minutes before the Bank's foreclosure sale and knowing it has absolutely no equity in the subject property, the Debtor should have anticipated that such emergency motions would be forthcoming and had its reorganization intentions in mind upon its filing on May 1, 1992, more than one month before the hearing in this matter.

2. During the hearing, much time was spent on the Debtor's explanation for having defaulted in its obligations to the Bank over the preceding seventeen months, beginning contemporaneously with the closing of Rhode Island Central Credit Union (together with the other non-federally insured financial institutions) pursuant to proclamation of the Governor of the State of Rhode Island. In a discourse reminiscent of the ongoing RISDIC hearings, this Court listened while David LaRoche described his 20 year business relationship with John Lanfredi, the immediate past president of Rhode Island Central Credit Union, and the fact that shortly before the demise of RICCU, he had obtained a "commitment" from Lanfredi to refinance the Debtor's loan from $2,500,000 up to $3,000,000 on a handshake—nothing in writing, no appraisals, no additional collateral—just a handshake. Mr. LaRoche now uses the Receiver's refusal to honor Lanfredi's alleged refinancing commitment as justification for not making any mortgage payments for the past seventeen months. This argument is preposterous and deserves no further comment.

In addition, the private dealings of Lanfredi and LaRoche are completely irrelevant to the legal issue of whether this Debtor can propose a feasible plan of reorganization within a reasonable period of time. That is the only dispositive question now under consideration.

posed plan of reorganization. According to the Debtor, through the testimony of its President, David LaRoche, it has sufficient net cash flow at the present time to make adequate protection payments due the Bank, *i.e.* interest only payments, based upon the stipulated value of the collateral of $1,550,000. In addition, to complete the development of the remaining 59 lots, the Debtor represents that its parent company, NECO Enterprises, Inc. ("NECO"), a holding company for Mr. LaRoche's various business enterprises, has agreed to provide as a capital contribution $8,000 per month, which will be sufficient to develop one additional mobile home site per month. Under this scenario, it will take (at least) five years to complete the development. Notwithstanding this five year completion period, the Debtor envisions that after just three years, with thirty to thirty-six additional lots in place, each bringing in an anticipated monthly gross rental of $280, the property will have increased in value to between $3,000,000 to $5,000,000. This projection, made by Peter Scotti, Debtor's real estate expert, is rejected as completely unsupported, but even assuming (hypothetically) its validity for a moment, the Debtor has not addressed how this projected leap in market value will translate into payment of the then outstanding principal and interest due the Bank.[3]

Additionally, the figures relied upon by the Debtor in support of its projected cash flow are unsupported by any specific evidence[4] and appear totally unrealistic based upon its performance during the preceding seventeen months. The Debtor has not satisfactorily accounted for the disposition of the rental income in the amount of $270,000 during the last seventeen months, nor has it adequately reconciled how the amount allegedly spent during that period will be substantially reduced going forward, as projected.

Moreover, the Debtor's reliance on the financial support of its parent NECO, has also been called seriously into question, and was not satisfactorily rebutted. The Bank presented NECO's Form 10–Q statement filed with the Securities and Exchange Commission for the quarter ending September 30, 1991. That statement shows an operating loss of $1,894,483 for the nine month period ending September 30, 1991, and a common stock deficiency of $7,827,482 for the same period. Most telling however, is the information contained in the note section. Specifically, we refer to the statements that "[o]ther than through the sale of land and dwellings presently in inventory, [NECO] Enterprises may not have sufficient unattached assets and/or financing ability to fund further development," and "[m]anagement is of the opinion that these factors [1991 attachment order on all the assets of NECO held in Rhode Island and remand order to turnover certain assets to financial institutions] indicate a substantial doubt about the ability of [NECO] Enterprises and/or its subsidiaries to continue as a going concern."[5] No credible

3. The Debtor submits that with the application of a capitalization rate of 12% to the anticipated net cash flow in those years, the property will be worth $3,250,000, which, it claims, would be sufficient to pay off the Bank and unsecured creditors which total $23,000. However, it will take at least five years to fully complete the project. In the meantime, the Bank will be receiving adequate protection payments on only the present value of the collateral, while its total contractual debt will be constantly increasing. Moreover, the Debtor does not disclose how it intends to pay off the Bank at the end of this five year period, *i.e.* does it propose an immediate sale of the property sufficient to pay off the Bank's mounting debt? If this is the case, the Court finds such an expectation to be pure fantasy, lacking any foundation or support.

4. The evidence presented in support of these figures was the testimony of Mr. LaRoche, and a summary of income and expenses for the period January 1, 1991 through May 31, 1992, purportedly prepared by the Debtor's accountant. However, Mr. LaRoche, who says he is "great with numbers," did not testify from any specific knowledge of the operating expenses of the Debtor, but rather from his general supervisory and entrepreneurial experience, which included a general discussion of the cost of running the park, the approximate operating expenses, and his unsupported opinion of the associated costs to complete the development and rental of the remaining lots. His testimony as to these matters is neither reliable nor credible.

5. Mr. LaRoche's explanation for this most damaging admission as to NECO's financial condi-

evidence was presented to demonstrate any change in circumstances from the date of this financial statement, or that NECO is capable of contributing even the $8,000 per month promised at the hearing. To put it mildly, this Court is highly skeptical of the Debtor's representation that the property will increase in value to between Three and Five Million Dollars in three years. Furthermore, without the absolute certainty of financing to complete the project, the Debtor's projections (which we do not accept) are meaningless.

In support of its motions, the Bank presented William E. Coyle, III, a qualified real estate appraiser who testified as to: the anticipated cost to complete the development of the remaining lots and to place roads on the property; the likely absorption rate; the time element involved; and the resulting projected gross rental income to be generated on the property in relation to its value. In Coyle's opinion, which we find to be well supported and credible, and based upon his personal knowledge of the background and financial history of the subject property, "it is highly unlikely" that the property will be worth between Three to Five Million Dollars three years from now.

As to all contested issues of fact, we accept the Movant's version over that of LaRoche. Further we conclude that the Debtor has not demonstrated a reasonable likelihood of rehabilitation.

Accordingly, in light of the foregoing findings and conclusions and pursuant to 11 U.S.C. § 1112(b)(1), the Bank's Motion to Dismiss is GRANTED, and this Chapter 11 case is DISMISSED.[6]

tion in 1991 was that "the way accountants see the world is not the way a businessman sees the world."

6. For appellate purposes, if required to do so, we would also find that the Movant has met its burdens under 11 U.S.C. §§ 362(d) and 363 and

would GRANT both its Motion for Relief from Stay, and Motion to Prohibit the Debtor's Use of Cash Collateral. Absent such appellate direction, said motions are both rendered moot by our Order of dismissal.